# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

TRACY ANDRIANO,

    Plaintiff,

v.

TYSON FOODS, INC.,
TYSON FRESH MEATS, INC.,
a subsidiary of Tyson Foods, Inc.

    Defendants.

)   **Docket No. 3:15-CV-0863**
)
)
)   **JUDGE CRENSHAW**
)
)   **MAGISTRATE JUDGE HOLMES**
)
)   **JURY DEMAND**
)
)
)

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Tracy Andriano brings this action against Tyson Foods, Inc. and Tyson Fresh Meats, Inc., a subsidiary of Tyson Foods, Inc. (collectively "Tyson") alleging violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000 *et seq* and Retaliation in Violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq*. Before the Court is Tyson's motion for summary judgment. (D.E. No. 32. )

### I.  Material Facts

#### A.  Plaintiff was a skilled and caring nurse at Tyson.

If anyone embodied Tyson's motto, "We choose to care," it was Plaintiff, Ms. Tracy Andriano. Tyson Fresh Meats, Inc. hired Ms. Andriano, in October 2013, as an Occupational Health Nurse. (Deposition of Plaintiff Tracy Andriano ("Pltf. Dep.") at 29:15-16.) Ms. Andriano was a skilled and caring nurse. She was well educated and trained, having both an associate's degree in applied science and a bachelor's degree in nursing. (Pltf. Dep. at 16: 1-2; 19: 11-13; Deposition of Audrey Cooper ("Cooper Dep.") at 17: 6-16.)  Ms. Andriano treated injuries that

Case 3:15-cv-00863   Document 37   Filed 03/01/17   Page 1 of 25 PageID #: 363

sustained by Tyson employees, and collaborated with other health, safety, production, and human resource team members in a comprehensive approach to the team members' health." (Pltf. Dep. at 30: 14-16.) Ms. Andriano worked the "B-shift" from 4:00 p.m. to 2:00 a.m. (*Id.* at 29: 17-19, 31:12-21.) Her starting pay was $28.50 an hour, but after 90 days on the job, she received a pay increase to $31.00 an hour. During her employment, Ms. Andriano never had any disciplinary issues and had been praised for her work and helping with others' work. (Pltf. Dep. at 199: 22-24.) Until immediately before her termination on May 6, 2014, she received no disciplinary actions. (Pltf. Dep. at 40:6-16.) Ms. Andriano remembers always getting compliments and "thank-yous." Other employees and supervisors thanked her for pulling charts for the dayshift nurses, stocking the cabinets, or calibrating the hearing test machine. (Pltf. Dep. at 200: 16-21; Exhibit 1, Andriano 0038; 0042; 0047; 0055; 0078.)

**B. The Tyson norm: hostility and harassment based on gender.**

Tyson treated men with more respect than women. Tyson treated women as inferior to men and did not discipline men, one female employee of Tyson, former B-Shift Supervisor, Ms. Cayman Carroll, a Line Supervisor, recalls. (Affidavit of Cayman Carroll ("Carroll Aff.) ¶ 21.) Ms. Carroll testified that women had to "keep our heads down and not say too much or volunteer information" because make supervisors ignored outspoken women. (Carroll Aff. ¶ 22; Deposition of Cayman Carroll "Carroll Dep.) at 16: 7-16.) Male managers would not address any problems presented by women at Tyson. Tyson either ignored women's concerns or did not take the concerns seriously. However, "if a man had proposed a new change or something to happen, it seemed like it was listened to a lot more …than if a women had proposed it." Tyson listened to men's concerns, but women "were more 'keep your head down, do what you're told' kind of thinking." (Carroll Dep. at 65: 5-12; 56: 7-12; 56: 7-12; Carroll Aff. ¶ 23.) Once, Ms. Carroll requested additional

translators, since most of the employees whom she supervised spoke other languages, "to be available" to her so that she could communicate with the twenty plus employees on her line. She made the request to Tyson General Supervisor, James Ewing. Instead of interpreters, Ms. Carroll received a disciplinary action in the form of a "Performance Improvement Plan." (Carroll Dep. at 23:21-25; 24: 1-5; 25:1-5.) Ms. Andriano had a similar experience on March 26, 2014, when she twice requested an interpreter so that she could appropriately assess an employee's injury. Instead, Ewing burst into the nurses' office and demanded the employee return to the floor, unassessed. (Exhibit 2, Andriano 0049.) Again, on April 9, 2014, Ms. Andriano needed an interpreter to assess an injured employee who spoke Arabic. Ewing came into the nurses' office and removed the interpreter, saying, "it's beef's problem. Let those Ass Monkeys get an interpreter." (Exhibit 3, Andriano 0059.) If a man had requested a translator, Tyson would have provided one. (Carroll Dep. at 65: 21-24; 26: 1.)

Tyson employees expected sexual harassment, and Tyson management tolerated sexual harassment. In general, in the past five years, Audrey Cooper, the B Shift Human Resources Manager, recalls team members reporting that they were touched, looked at, and been the subject of inappropriate comments. "We get those [complaints], especially in [the past] five years." (Cooper Dep. at 14: 1-14.) Ms. Andriano was the victim of one such inappropriate comment in November 2013, when Ms. Andriano attended a meeting with plant personnel to investigate an employee injury. (Pltf. Dep. at 41: 6-11; 42:24-43:1; Exhibit 4 Andriano 0033-0034.) Ms. Andriano was the only female in attendance. During the meeting, Supervisor Ewing made a comment of a sexual nature to Ms. Andriano. Ewing told her that he wanted to "see how far I can get with you." (D.E. 1, Complaint ¶¶ 13, 14; Exhibit 4 Andriano 0033-0034; Pltf. Dep. at 46:16-21.) This comment offended and upset Ms. Andriano. She felt scared because she "was the only

female in the room at night with a bunch of men." (Pltf. Dep. at 47: 12-18.) Steve Ligon, B-Shift Operations Manager, intervened and instructed Ewing to "stop that right now." (Pltf. Dep. at 47:20-25; Deposition of Steve Ligon ("Ligon Dep.") at 13:6-8.) Ms. Andriano told her supervisor, Simona Thomas, the very next day. She told Thomas that the incident made her afraid. (Pltf. Dep. at 53: 1-25.) However, Tyson did not terminate James Ewing; they retrained him on Tyson's Harassment and Discrimination policy. (Cooper Dep. at 33:14-16.) Ironically, Ewing was one of the first responders when Ms. Andriano endured an attempted sexual assault by a male employee: Driton Gashi.

### C. Tyson protects its own: Driton Gashi.

Tyson employed Driton Gashi as an hourly employee in the Material Handling Department (Deposition of Steve Voller ("Voller Dep." At 14:5-7; 21:13-18.) Gashi was Tyson's "problem child" whom Tyson never had the nerve to kick out of the house. He was the brother of a Supervisor, Jetton Gashi, and brother-in-law of an A-shift General Manager, Valon Arifi. (D.E. 1 Complaint ¶ 9.) Gashi was the subject of at least one sexual harassment complaint before Ms. Andriano's employment at Tyson. (Cooper Dep. at 14:18-25; 15:1-1.) Gashi seemed to enjoy sexually harassing women. Ms. Carroll remembers Gashi well, as she and Gashi's paths crossed several times a day. Ms. Carroll could see Gashi as she supervised her line. (Carroll Dep. 60: 20-25.) He went out of his way to be near women and "would stare at different women throughout the day." (Carroll Aff. ¶ 7.) He would gaze at women for five to ten minutes, and then return to the same location and stare again. (Carroll Aff. ¶ 8; Carroll Dep. at 61: 6-20.) He particularly gaped at American women. (Carroll Dep. at 61: 3-5.) Many women, including Ms. Carroll, felt uncomfortable around Gashi. "I avoided him as much as possible," Ms. Carroll remembers. "The way he would talk to me, the way his eyes would kind of roam on me, not look at my

face…seemed to be looking more at the body;" which made her uncomfortable. (Carroll Dep. at 62: 5-19; 63: 4-5; Carroll Aff. ¶ 9.) Gashi sometimes made a point to stand so close to Ms. Carroll that she could smell his breath. (Carroll Dep. at 62: 20-22.)

There was one woman whom Gashi took a special interest in: Plaintiff Tracy Andriano. Gashi began to prey upon Ms. Andriano soon after she began working at Tyson. He frequently stared at Ms. Andriano in the hallway. (Carroll Dep. at 47: 16-18; Pltf. Dep. at 72:12-21; Ms. Carroll Aff. 10.) Tyson ignored Gashi's gawking. Gashi grew bolder. He began going out of his way to see her at the Health Services Office. Ms. Carroll remembers seeing Gashi "hanging out" at the nurses' station "quite a few times" and thought this was "unsettling." (Carroll Dep. at 44:1-11; Pltf. Dep. at 56: 15-25.) He began bringing Ms. Andriano candy, which, at first, she first thought was nice. But when he began to bring her candy "almost every day," she became upset. (Carroll Dep. at 41: 7-13.) Ms. Andriano soon determined that Gashi's behavior was "creepy," and she felt uncomfortable. (Carroll Dep. at 47: 16-18.)

Although Ms. Andriano asked Gashi to stop bringing her candy, he did not. In fact, Gashi's behavior toward Ms. Andriano became increasingly bold. He began asking her to dinner. He was "always asking me to dinner and giving her compliments that were "too much," "creepy," and "uncomfortable." (Pltf. Dep. at 58:3-5; Exhibit 5, Tyson 0070.) Each time he made her uncomfortable, she asked him to stop. (Pltf. Dep. at 59: 20-25; 57: 17-25; 58: 1-25; 73: 10-14.)

**D. Andriano reported the harassment, but Tyson chose not to care.**

Ms. Andriano told several Tyson employees about her disturbing contacts with Gashi. She told line Supervisor, Ms. Carroll. Ms. Andriano and Ms. Carroll spoke about Gashi on several occasions, especially when "we would see him gawking at us…standing in the middle of the hallway, staring at us." (Pltf. Dep. at 65: 1-17.) Plaintiff also reported Gashi's behavior to

Supervisor Jetton Gashi, Driton Gashi's brother. She informed him in an angry and stern way that "his brother needs to leave me alone." She told him at least twice. (Pltf. Dep. at 71: 8-19; 72: 1-5.)

Ms. Andriano reported Gashi's behavior to her direct supervisor, Simona Thomas. Ms. Ms. Andriano told Thomas that Gashi was stopping be health services too often and asking her to dinner. (Pltf. Dep. at 60:7-13; 61: 9-25; Carroll Dep. at 42: 4-11.) However, Thomas dismissed Ms. Andriano's concerns, replying with words to the effect of "he's harmless," and "the area is safe." (Pltf. Dep. at 62:22-25).

Ms. Andriano did not report Gashi's behavior to Human Resources "HR". She did not have to. Ms. Andriano felt most comfortable telling her direct supervisor, with whom she spoke on a daily basis after her shift, about Gashi. (Pltf. Dep. at 63: 7-8.) Tyson did not require that Ms. Andriano to report the incident to HR. As Audrey Cooper, HR Supervisor, noted, "She can contact her supervisor, she can contact HR, or she can contact any member of management." Ms. Andriano had choices. (Cooper Dep. at 22: 1-12.) Ms. Andriano chose to report the harassment to Thomas.

### E. Gashi's "somewhat believable" attempted assault on Ms. Andriano.

By February of 2014, the undisciplined Gashi became more aggressive toward Ms. Andriano---physically aggressive. He began grabbing her hand when he stopped by the nurses' office to give her candy. (Pltf. Dep. at 74: 1-24.) Gashi also began asking her on dates. (Pltf. Dep. at 78: 9-12.) It was around that time that Gashi began to make sexually suggestive noises at her, noises that a man would make when he is "hitting on you," for instance, "kissy noises." (Pltf. Dep. at 80: 11-16; 80: 23.) He did that often beginning in February of 2014. Plaintiff asked him to stop. Plaintiff also reported these incidences to Thomas. (Pltf. Dep. at 74: 1-24; Pltf. Dep. at

81: 5-25.) She told Thomas that Gashi was "still bothering her." (Pltf. Dep. at 83: 21-22.) Plaintiff trusted Thomas to handle the situation, since Thomas was Plaintiff's manager, and had previously told her not to go to HR. (Pltf. Dep. at 83:13-15.)

On April 10, 2014, Gashi's sexual aggression became out of control. An incident occurred close to the end of Plaintiff's shift when Plaintiff was alone. Gashi came to Ms. Andriano's office and put candy on the table. He proceeded to ask her, "Are you alone?" She asked him, "Why?" (Pltf. Dep. 84-1-25.) When she reached to the table to remove the candy, he grabbed her hand and "wouldn't let go." Ms. Andriano recalls,

```
1    …he started
2    pulling my arm towards him.  And then he proceeded to
3    come around the desk, around my desk.  And I got up, an
4    I started walking, and he started walking towards me.
5    And I started running, and he was running after me.  I
6    mean, heck do I know if he's going to rape me on one of
7    the exam tables.
8    I ran right out the back door because
9    that one locks by itself, and he followed me through the
10   back door.  I ran right around the corner, back in
11   through the front, and locked the door.
```

 (Pltf. Dep. at 85: 1-11.) Ms. Andriano locked herself in her office, but Gashi tried to open the door. (Pltf. Dep. at 85: 20-23.) In a panicked state of mind, Ms. Andriano picked up the radio and announced over the radio to the supervisors that she locked the door "for security reasons." (Pltf. Dep. at 95: 17-25; 86: 6-9.) Ironically, it was James Ewing, the Supervisor who had previously told her "he wanted to see how far he could get" with her, who came to her office to see what was the matter. (Pltf. Dep. at 87: 1-3.) Soon after that, several others arrived including Ms. Carroll. (Pltf. Dep. at 87: 5-20.) Ms. Andriano informed all of them that Gashi had chased her and that she was keeping the doors locked because she was alone. She was crying. (Pltf. Dep. at 88: 10-23.) One employee, Andy Bell, offered to begin walking her to her car every night so

that she would not have to be alone. (Pltf. Dep. at 89: 15-22.)  Ms. Carroll recalls that Ms. Andriano was "rattled" and upset by the situation. (Carroll Dep. at 67: 2-10.) Ms. Andriano asked Ms. Carroll to walk around with her so that she would not be alone if Gashi approached her. (Carroll Aff. ¶ 14.) Ms. Andriano told Ms. Carroll that she felt unsafe. (Carroll Dep. at 33:13-23.)

The night of the attempted assault, Ms. Andriano left a message for Thomas. (Pltf. Dep. 90:1-12.) The following day, when she reported Gashi's behavior and the incident to Thomas in person, Thomas stated, "we can't go to HR." Thomas stated that she planned to contact Gashi's supervisor and report that Gashi was "coming to talk" to Ms. Andriano too much "because we can't report it as harassment." (Pltf. Dep. at 99: 1-1.3.) Thomas proceeded to email Steve Voller, who was the General Supervisor over Gashi's department on April 11, 2014, stating:

> 1 … Steve, it has been
> 2 brought to my attention that Driton Gashi has been
> 3 stopping by health services to visit almost every night
> 4 at the end of his shift. He has not had a
> 5 medical issue or question, just to chat. This takes up
> 6 time that my nurses should be completing their work. I
> 7 have spoken with the B-shift nurses and informed them
> 8 extended visits, chat sessions with team members, or
> 9 TMs, supervisors that is not medical-related is
> 10 unacceptable. I am asking that you express to Driton
> 11 that, from my standpoint, I find it unacceptable and
> 12 request that he refrains from socializing in health
> 13 services. If he has a medical question, concern, or any
> 14 medical assistance, then, by all means, please come to
> health services.

(Pltf. Dep. at 102:2-25.; Exhibit 6, Andriano 0060; Voller Dep. at 14:3-7, 21:13-18.) Ms. Andriano disagreed with Thomas's email because what Thomas described is not what she had reported to Thomas. (Pltf. Dep. at 102: 20-25; 103: 1-7.)

The following day, Friday, April 11, Gashi stopped outside of the window of Ms.

Andriano's office and made obscene gestures. He stuck his tongue out repeatedly. (Pltf. Dep. at 105: 10-21.) The following day she reported to Thomas that Gashi was making obscene motions with his tongue. (Pltf. Dep. at 108: 1-9.) On Monday, April 14, Voller came into the nurses' office and apologized to Plaintiff. (Pltf. Dep. at 108: 12-25.) He stated that he had seen the video of Gashi's behavior on Friday, April 11, 2014, and that he was displeased by Tyson's handling of the situation. (Pltf. Dep. at 109: 1-6.) He informed her that Gashi had "past incidents" in which Tyson had taken no action regarding Gashi. Voller reported the incident to HR on Monday, April 14.

Upon his report, Audrey Cooper began to investigate the incident and requested that she write a statement regarding the incident. When Cooper requested the statement, Ms. Andriano informed Cooper about the obscene faces at the window. (Pltf. Dep. at 113:1-24.) Thomas told Ms. Andriano that "I feel bad, I do, but you brought this on yourself. You went to HR." (Pltf. Dep. at 174: 23-25; 175: 1-4.) Later, Cooper came to pick up the statement, which read, "Please be advised on the situation that occurred between myself and Driton Gashi…On Thursday night, April 10th, 2014." Ms. Andriano explained in detail that "Gashi was making unwanted, uncomfortable, and inappropriate comments to me. He informed me that he knew I was here alone …and proceeded to approach me and tried to grab my hand while asking me to dinner. He then placed candy on the counter and asked me 'what I was going to give him' in return. The next evening he walked past OHS and stopped in the front door window. Proceeded to move his tongue in a sexually suggestive way that was creepy. I then locked the door and advised supervisors in the plant to either radio me or knock on the door for medical issues in fear of being alone." (Plaintiff Dep. at 117: 1-21; Cooper Dep. at 40: 2-22.) Plaintiff wrote a statement to this effect on April 14, 2014. (Exhibit 7, Andriano 0064.)

Despite having all of these details at her disposal, when Cooper made notes during the

investigation, she did not include the details. Cooper only noted that Ms. Andriano was "uncomfortable" by the way Gashi "looked at her." (Pltf. Dep. at 41: 9-23.) Cooper also noted that Ms. Andriano's statement,--the statement of a well-trained, educated, nurse and employee with a spotless disciplinary record--was only "somewhat" believable in comparison to the statement of a known sexual predator, Driton Gashi. (Cooper Dep. at 42: 1-25; Exhibit 8, Tyson 0067.) In her deposition, Cooper rationalized, "We could not substantiate her claim, and I think her claim was that he made a sexual gesture, and I think she said that he asked her out. And we could not substantiate that that happened. He said that he asked her and her entire family out to dinner." Tyson's responded to the multiple complaints and documented incidences that took place between Gashi and Ms. Andriano by insisting that Tyson retrain both Ms. Andriano and Gashi on Tyson's Sexual Harassment and Discrimination Policy. Tyson administered the same response to both predator and the victim. (Cooper Dep. at 35: 5-10.)

On May 6, 2014, a conference took place between Ms. Andriano, Thomas, and Cooper. Ms. Andriano thought the subject for discussion was an incident involving an employee's wrist injury. (Pltf. Dep. at 158:3-9.) Soon, Ms. Andriano realized the meeting concerned the sexual harassment complaints. Ms. Andriano believed she was about to be terminated. She felt cornered. (Pltf. Dep. at 180: 9-10.) She took her phone out of her pocket and stated she wanted to record the conversation. (Cooper Dep. at 56:14.) Ms. Andriano informed Cooper that she did not felt like her supervisor was "doing enough for her, or that she wasn't there for her, and that her supervisor did not help with her complaint." (Pltf. Dep. at 167:11-14; Cooper Dep. at 52:13-53:2, 64:1-5; Cooper Dep. at 56:18-20.) Cooper and Thomas reprimanded her for using the radio to call for help the night of Gashi's attempted assault, and for locking the door when she felt unsafe. (Pltf. Dep. at 161: 12-22.) Thomas also reprimanded Ms. Andriano for using the radio. She stated

that Ms. Andriano should have called the security desk instead. (Pltf. Dep. at 96: 4-20.) "I started crying. I wanted to leave. They said, if you leave, that means you quit. Are you quitting?" (Pltf. Dep. at 159: 5-7.) She wanted to go home. (Cooper Dep. at 56: 21-23.) "She wanted to go home. She wanted to go home. She asked to go home." (Cooper Dep. at 63: 8-10.) She also wanted to call her husband. (Cooper Dep. at 58 15-17.) She also stated she wanted to call the Call Tyson First Helpline. Cooper thought that was inappropriate for her to have her phone out, and was a reason to discipline an employee. (Cooper Dep. at 61: 14-24.) Instead of allowing her to call the help line, tape the conversation, call her husband or go home, Cooper kept her in the room. Ms. Andriano felt like she was being "picked apart" when she had never had any issues previously." (Pltf. Dep. at 199: 20-24.) At that point, Cooper decided to implement the "open door policy" and bring yet another individual into the room, Gary Denton, Complex Human Resources Manager, to "talk about it." (Cooper Dep. at 57:6-19.) Cooper explained that "every member can call the helpline…but what we try to tell team members is that those helpline calls filter back to the plant. ***So we're still going to do the investigation***. So just talk to us, see what is going on." (Cooper Dep at 57: 11-16.) Cooper told Ms. Andriano that even if she called the helpline, the complaint is going to come back to Cooper at the HR department to handle. (Cooper Dep. at 58: 1-4.) Denton told her, however, "No, you're not [going to call the helpline]. That's not for you. That's just for the team members on the floor. That's not for you." (Pltf. Dep. at 159: 13-16.) After the meeting, Cooper requested that both Thomas and Plaintiff provide written statements. (Cooper Dep. at 64:5-9; Pltf. Dep. at 169:4-10.) Ms. Andriano was so upset that she left. "She walked out that night and left." (Cooper Dep. at 74: 12-13.)

The following day, May 7, 2014, Ms. Andriano documented both the hostile work environment and sexual harassment in an email to Thomas, Denton, Rowen, and Cooper

detailing the harassment and the change in the work environment since April, when she complained about the harassment. At that point, Ms. Andriano did not feel like she could go back Tyson, a place that she "didn't feel safe, so she had no choice but to resign. (Pltf. Dep. at 199: 6-13.)

Ms. Andriano called the helpline on May 8, 2014. (Cooper Dep. at 69: 20-24.) On May 10, 2014, two days after Ms. Andriano called the help line, an employment action was issued by Tyson stating that Ms. Andriano's employment action was listed as "terminated" as the transaction type. (Cooper Dep. at 71: 2-12; Exhibit 9, Tyson 0385.)

### F. Tyson retrained Gashi and allowed him to continue to harass women.

Ms. Carroll noticed that Tyson terminated Ms. Andriano's "very quickly" after that near assault incident with Gashi. Gashi, on the other hand, remained at Tyson, where he enjoyed his view. He was still staring at women. Ms. Carroll still felt uncomfortable around him. Other women seemed to feel uncomfortable as well: "Women still avoided him. We walked down a different hallway if we knew he was coming." (Carroll Dep. at 68: 14-25; 69: 1-8.) Tyson both retained and retrained Gashi, despite previous complaints, other than Ms. Andriano's, filed concerning sexual harassment in the workplace. (Cooper Dep. at 13: 12-16.) In general, Cooper recalls team members reporting that they were touched, looked at, and been the subject of inappropriate comments. "We get those [complaints], especially in [the past] five years." (Cooper Dep. at 14: 1-14.) Cooper remembers that Gashi was involved in one other sexual harassment complaint, brought by a female officer who was working at the front desk. (Cooper Dep. 14: 18-25; 15: 1-1.) After Ms. Andriano's complaint and investigation, Gashi was "retrained" but not disciplined. (Cooper Dep. at 35: 12.) Meanwhile, Ms. Andriano placed two phone calls to the

Call Tyson First Helpline, one on May 8, 2014, and another on May 15, 2014. Tyson returned neither. (Exhibit 10, Tyson 382.)

When Tyson chose to retain, "retrain," and protect employees who repeatedly sexually harassed women and shield upper management employees who tolerated the sexual harassment, Tyson lost a skilled and caring nurse who, as the record makes abundantly clear, genuinely cared about her Team Members. Ms. Andriano chose to care. She did not want to be the type of nurse that "only care about money," because she cared more about her Team Members. (Exhibit 11, Tyson 0216.) Ironically, the footer of almost each Tyson email states, "We choose to care." (Exhibit 12, Andriano 0043; 0052; 0056; 0061; 0066; 0068; 0071; 0074; 0079.)

Nothing could be farther from the truth.

## II.  LEGAL STANDARD

Defendant as moving party has the initial burden of showing this Court, by reference to the record, the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in one of two ways; either by negating an essential element of the non-movant's case or by showing that there exists no such evidence to support a fact necessary to the non-movant's case.  *Clark v. Coats & Clark*, *Inc.*, 929 F.2d 604, 606-608 (11th Cir. 1991).  Before the Court can evaluate the Plaintiff's opposition to the motion, it must first determine whether the Defendant has met its initial burden of showing that there are no issues of material fact and that Defendant is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F3d 248, 254 (11th Cir. 1997)(*per curiam*); *Rodgers v. Banks*, 344 F3d 587, 595 (6th Cir. 2003).

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving

party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c.) The Court is required to view "the facts and reasonable inferences in the light most favorable to the nonmoving party . . . ." Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016) (citing Cass v. City of Dayton, 770 F.3d 368, 373 (6th Cir. 2014.)

In the case *sub judis*, Defendant cannot meet, nor has it met its initial burden that no issue of genuine fact exists, no less that the burden should shift to Plaintiff. Therefore, Defendant's motion for summary judgment should be dismissed.

## III.   LAW AND ARGUMENT

### A.   Defendant Has Failed to Demonstrate that No Material Facts are in Dispute.

In order for Ms. Andriano to maintain a prima facie case for sexual harassment, she must show that (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on her status as a member of a protected class; (4) the harassment affected at term, condition, or privilege of employment; and (5) there is some basis for liability on the part of the employer. *Ellsworth v. Pot Luck Enters.,* 624 F.Supp.2d 868, 875-876, (M.D. Tenn. 2009); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270, (6th Cir. 2009).

Defendant's argument that Plaintiff's claims fail as a matter of law.  Plaintiff's Response to Defendant's Statement of Undisputed Facts and Plaintiff's Statement of Additional Material facts demonstrate disputed issues of facts which are material.

### B.   Tyson Subjected Plaintiff to Sexual Harassment under Title VII

Defendant accurately points out that tp prove a claim of hostile work environment by a coworker, Ms. Andriano must show by a preponderance of the evidence that: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of

employment and create an abusive working environment; and (5) the employer is liable for the harassment because it knew or should have known of the harassment and unreasonably failed to take prompt remedial action. *Waldo v. Consumers En ergy Co.,* 726 F.3d 802, 813 (6th Cir. 2013) (citing *Williams v. CSX Transp. Co.,* 643 F.3d 502, 511 (6th Cir. 2011)); *see also Fenton v. HiSAN, Inc.,* 174 F.3d 827, 829-30 (6th Cir. 1999).

1) **Tyson subjected Ms. Andriano to unwelcome harassment based on sex**.

Defendant attempts to segment and analyze each instance of harassment in Andriano's claim and argues that each, on its own, taken without the others, was not severe or pervasive enough to meet the abusive working environment standard. This line of thinking is without merit. The court, as would the trier of fact, must consider the totality of the circumstances. In this case, Ewing, who was a supervisor and should demonstrate and exemplify a higher ethical standard of behavior, told Ms. Andriano that he wanted to "see how far I can get with you." (D.E. 1, Complaint ¶¶ 13, 14; Exhibit 4 Andriano 0033-0034; Pltf. Dep. at 46:16-21.) This comment offended and upset Ms. Andriano. Gashi's numerous incidents of sexual harassment, all of which made Ms. Andriano uncomfortable: bringing her candy, asking her to dinner, touching her, making sexual noises, making sexual facial expressions, and a near violent sexual assault that made her afraid. Those facts speak for themselves, and should be presented to a trier of fact for further analysis. (Pltf. Dep. at 74: 1-24; Pltf. Dep. 84-1-25; Pltf. Dep. at 85: 1-11; Pltf. Dep. at 85: 20-23; Pltf. Dep. at 105: 10-21.)

2) **Plaintiff has provided ample facts that demonstrate that Tyson knew or should have known of the charged sexual harassment.**

Defendant attempts to argue that simply because Ewing and Gashi were not Ms. Andriano's supervisor, she cannot demonstrate Tyson's liability per *Waldo*, 726 F.3d 802, 813 fn. 2 (citing omitted); *Williams v. General Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999)

(plaintiff must show that employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."). However, Tyson was well aware. Ms. Andriano told several Tyson employees in supervisory roles about her disturbing contacts with Gashi. She told line Supervisor, Ms. Carroll. (Pltf. Dep. at 65: 1-17.) Plaintiff also reported Gashi's behavior to Supervisor Jetton Gashi, Driton Gashi's brother, at least twice. (Pltf. Dep. at 71: 8-19; 72: 1-5.) Ms. Andriano reported Gashi's behavior to her direct supervisor, Simona Thomas. (Pltf. Dep. at 60:7-13; 61: 9-25; Carroll Dep. at 42: 4-11.) However, Thomas dismissed Ms. Andriano's concerns, replying with words to the effect of "he's harmless," and "the area is safe." (Pltf. Dep. at 62:22-25). As stated, supra*, **Tyson did not require Ms. Andriano to report Gashi's behavior to HR**. Ms. Andriano felt most comfortable telling her direct supervisor. (Pltf. Dep. at 63: 7-8.) By February of 2014, when Gashi became more aggressive, by grabbing her hand, asking her on dates, and making sexually suggestive noises, Plaintiff also reported these incidences to Thomas. (Pltf. Dep. at 74: 1-24; Pltf. Dep. at 81: 5-25.) She told Thomas that Gashi was "still bothering her." (Pltf. Dep. at 83: 21-22.) On Friday, April 11, Gashi when Gashi made obscene gestures at the window, Plaintiff did not have to tell anyone, because it was video recorded, but she still reported it. (Pltf. Dep. at 105: 10-21.) (Pltf. Dep. at 108: 1-9.) (Pltf. Dep. at 108: 12-25.) Voller even stated that he had seen the video of Gashi's behavior on Friday, April 11, 2014, and that he was displeased by Tyson's handling of the situation. (Pltf. Dep. at 109: 1-6.) Voller informed her that Gashi had "past incidents" in which Tyson had taken no action regarding Gashi. Voller reported the incident to HR on Monday, April 14. (Pltf. Dep. 109: 13-17.)

### 3) Tyson failed to implement prompt and appropriate corrective action.

Plaintiff has also provided ample facts that demonstrate that Tyson failed to implement prompt and appropriate corrective action. Tyson, in general, had a sexual harassment problem. Cooper recalls team members reporting that they were touched, looked at, and been the subject of inappropriate comments. "We get those [complaints], especially in [the past] five years." (Cooper Dep. at 14: 1-14.) Tyson, in general, had a "Gashi" problem. However, Tyson retained and retrained Gashi, rather than terminating or more harshly disciplining him. (Cooper Dep. at 13: 12-16; Cooper Aff. 14: 18-25; 15: 1-1.) Even after Ms. Andriano's complaint, which included the obscene facial expressions, Gashi was "retrained" but not disciplined. (Cooper Dep. at 35: 12.) After the videotaped incident, Voller informed Ms. Andriano that Gashi had "past incidents" in which Tyson had taken no action regarding Gashi. Voller reported the incident to HR on Monday, April 14. (Pltf. Dep. 109: 13-17.) Meanwhile, Ms. Andriano placed two phone calls to the Call Tyson First Helpline, one on May 8, 2014, and another on May 15, 2014. Tyson returned neither one. (Exhibit 10, Andriano 0034.) Whether Tyson's response to reports of sexual harassment was prompt and remedial, if Tyson responded at all, is an issue of material fact that should be presented to a jury. A jury could reasonably conclude that not returning a helpline call is not a prompt remedial action. A jury could conclude that a complaint to the helpline, which in turn was rerouted back to the individuals at Tyson who were the subject of the complaint, is not timely or remedial. Finally, Ms. Andriano argues that Tyson's decision to retrain Gashi and her was an ***unequivocally inappropriate*** response. A reasonable juror could conclude that ***retraining the victim*** on Tyson's Sexual Harassment Policy is inappropriate.

### C.     Tyson Created a Hostile Work Environment for Plaintiff under Title VII.

Defendant attempts to minimize Gashi's harassment of Ms. Anriano, and portrays Gashi as a polite employee, who delivered candy, shook hands, and stopped in the nurses' office to visit.

Defendant goes even further boldly to suggest that being the subject of "kissy noises," requests for dinner, and unwelcome stares were "isolated incidents" not worthy of Ms. Andriano's sexual harassment claim. However, As the Supreme Court has pointed out, ***no mathematically precise test can be used*** to determine whether a work environment is hostile or abusive. Whether a work environment is hostile or abusive can only be determined by looking at ***all the circumstances*** (emphasis added). *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Therefore, the hostility of a work environment is fact specific and is to be determined by the trier of fact. It is not the appropriate topic for summary judgment. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Further, "Certainly Title VII bars ***conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct*** (emphasis added.) Defendant Tyson may not be offended by kissy noises and physical assaults, as clearly it is not since it chooses to retrain rather than discipline its employees, but Ms. Adnriano was offended. "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive," *Id.* citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The Court goes further in *Harris* to state that no mathematically precise test can be used, and instead whether a work environment is hostile or abusive can only be determined by looking at all the circumstances. *Id.* The hostility of a work environment is fact specific and is to be determined by the trier of fact, i.e. that it is not the appropriate topic for summary judgment.

This Court's analysis should stop there as this is a matter for a trier of fact to determine. However, even if the Court determines further demonstration is necessary, that being 1) that

Plaintiff is a member of a protected class, 2) that she is subject to unwelcome harassment, 3) the harassment was based on her status as a member of a protected class, 4) the harassment affected a term, condition, or privilege of employment, and 5) there is some basis for liability on the part of the employer, ***summary judgment is still inappropriate*** (emphasis added). *Ellsworth v. Pot Luck Enters.*, 624 F.Supp.2d868, 875-876 (M.D. Tenn. 2009); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). As set out above, Plaintiff was subjected to being "hit on" by Gashi with a clear indication from him he wanted sexual relations from her. Despite her repeated reporting to her supervisor nothing was done to correct his efforts and motives. Leaving Gashi unchecked ultimately led to Plaintiff being physically assaulted when Gashi chased her around her desk and grabbed her hand and arm dragging her closer to his body.

In determining whether an employer is liable for its supervisor's actions, the Court must view the facts in a light most favorable to the Plaintiff and determine 1) whether the supervisor's harassing actions were foreseeable or fell within the scope of his employment and 2) even if they were, whether the employer responded adequately and effectively to negate liability. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994). Again, there is an enormous genuine issue of material fact as to whether the Defendant knew of Gashi's predatory propensities. This Court is not left with just Plaintiff's repeated reports to her supervisor of his conduct, but has the testimony of other female employees, including HR members, of a history of prior complaints. Of important note is the fact only after his physical assault of Plaintiff, Gashi is merely retrained and allowed to keep his job. There is no evidence that Defendant undertook any serious investigation of the other women's complaints who were subjected to his harassment after Plaintiff's assault.

**IV.     Defendant, Tyson is Not Shielded from Liability Under the *Faragher/Ellerth* Defense or any Other.**

Initially, it should be noted that the *Faragher/Ellerth* Defense is a matter to be determined by a trier of fact as to liability for damages suffered by Plaintiff. "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. See Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778. The preponderance of the evidence standard alone indicates that a trier of fact should determine whether this defense exists. Therefore, Defendant's assertion of this defense in a motion for summary judgment inappropriate. Defendant's HR was aware of multiple instances of harassment, and no disciplinary action was taken. Therefore, Gashi's actions against Plaintiff were foreseeable and no reasonable effective actions were taken to prevent or correct the matter.

The Defendant again tries to argue that the Court in *Gallagher* addresses this issue. The Defendant, however, fails to include that the Court has stated "[A}n effective harassment should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Thornton v. Federal Express Corp., 530 F.3d 451, 456 (6th Cir.2008),* (quoting Clark v. United Parcel Service, Inc., 400 F.3d at 341, 349–50 (6th Cir.2005)). Plaintiff followed the policy and reported to her direct supervisor. Her supervisor, however, buried these complaints and pressured Plaintiff not to report these incidents to HR. Defendant violated this standard when she did not report Gashi's indiscretions to upper management and instead covered for them. This is the same

supervisor that to disciplinary action against Plaintiff after her multiple reports and her burying of Plaintiff's complaints became known to HR and upper management.

### V. Plaintiff experienced Retaliation for her Complaints of Sexual Harassment.

In retaliation cases, the 6th Circuit has held that examples of materially adverse employment action include: termination, demotion, decrease in wage or salary, a less distinguished title, material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996). This is a clarification of the third element of the necessary elements a plaintiff must prove in a retaliatory discharge matter. These elements are as follows:

1. That the plaintiff engaged in an activity protected by statute;

2. That the defendant had knowledge of the plaintiff's exercise of protected activity;

3. That the defendant after that took an employment action adverse to the plaintiff; and,

4. That a causal connection existed between the protected activity and the adverse employment action. *Ford v. General Motors Corp.*, 305 F.3d 545, 552-53(6th Cir. 2002).

Plaintiff has established in her complaint and in her facts section of this memo that she was exercising her rights under Title VII by making complaints about the harassment she suffered at the hands of Gashi. Plaintiff has further established that Defendant had knowledge of Gashi's harassment. Instead of disciplining Gashi, Tyson retaliated against Ms. Andriano. Ms. Andriano had no choice but to resign from Tyson.

### a) Plaintiff has identified an adverse employment action.

Defendant attempts to assert that Andriano's retaliation existed in the form of embroidered coats and exclusions from email chains. The retaliation Andriano experienced is much more profound, however. Tyson's "chain of command" is critical in order to understand the retaliation Ms. Andriano experience.

Andriano made numerous attempts to exercise her rights under Title VII, and each time she did, she believed her job was on the line. In reporting the harassment to Thomas, rather than HR, Andriano was following Tyson's formal "chain of command" policy. An email from Thomas to her staff, although purportedly not referring to sexual harassment complaints, provides insight into this dysfunctional hierarchy. Thomas's email to her subordinates reads: "Ladies…Before sending out e-mails to plant upper management, I ask first that you e-mail myself or speak to me. *If at that time* I feel the upper management needs to be aware of the issue requested, et cetera, I will speak directly to them or forward the e-mail on. Since I am the nurse manager, every e-mail that is sent out comes back to me as well as any repercussions. When these e-mails go out, I am the one who has to answer as to why my nurses are sending out these e-mails to upper management and *not following the chain of command* (emphasis added). (Exhibit 13, Andriano 0073-74.) Logic dictates that even though this email pertains to some issue other than harassment, Thomas expected her subordinates to come to her first, at which time *Thomas would decide* whether upper management needs to be aware of the issues. This email also suggests Thomas herself is afraid of "repercussions" from upper management. This email, regardless of its subject matter, correlates perfectly with what Thomas told Andriano repeatedly regarding Gashi: "follow the chain of command and *not* go to HR" with problems. Andriano believed that if she wanted to keep her job, she should not go to HR to report Gashi's behavior. (Pltf. Dep. At 67:14-23; 70: 4-11.)

Even though Andriano followed Tyson's policy, of reporting to whom she wishes, as well as followed Tyson's "chain of command," reporting Gashi's behavior to Thomas, Gashi's behavior continued. (Carroll Dep. at 64: 15-25.) Since it was Tyson's "norm" to tolerate inappropriate male behavior in the workplace, "Tyson would discipline management, but not an operator [like Gashi]." (Carroll Aff. ¶ 16.) Carroll did not report the Gashi incidents to HR either, but for a different reason. Carroll thought it futile to report the incident to HR because "it seemed more often they [employees' concerns] were swept under the rug than dealt with. (Carroll Dep. at 48: 21-25.) Since Tyson ignored women's issues in the workplace, it is no surprise that Tyson ignored Gashi's inappropriate behavior. (Carroll Aff. at 64: 15-19.)

To Cooper, the chain of command was circular in nature because, "…at the end of the whole story, HR is going to be the person who is going to do the investigation…*but no matter who they come to, the investigation starts and ends with HR*" (emphasis added). (Cooper Dep. At 28: 11-22.) Ironically, even calls to the Call Tyson First helpline went to HR rather than a neutral third party. No wonder Andriano felt scared of losing her job. She had exhausted both Thomas's and Cooper's chains of command. Neither led her anywhere. She had only the Call Tyson First Helpline to turn. Unfortunately, Tyson routed all of the helpline calls, not to a neutral third party, but back to the plant, in this case, Cooper, who found Andriano to be only "somewhat believable." Tyson's system for reporting problems of any kind, even those of a more serious nature, was dysfunctional at best and left Andriano helpless.

Everything came to a head in the conference between Ms. Andriano, Thomas, and Cooper on May 6. Ms. Andriano felt cornered. She believed Tyson would soon terminate her. (Pltf. Dep. at 180: 9-10.) She tried to express herself, to say that she did not felt like her supervisor was "doing enough for her, or that she wasn't there for her, and that her supervisor did not help with her [sexual

harassment] complaint." (Pltf. Dep. at 167:11-14; Cooper Dep. at 52:13-53:2, 64:1-5; Cooper Dep. at 56:18-20.) But, Cooper and Thomas railroaded her. (Pltf. Dep. at 165: 22-25.) They asked her about her marriage, about her depression, about her personal life. (Pltf. Dep. at 159:1-5.) They scolded her for using the radio, and for locking the door when she felt unsafe. (Pltf. Dep. at 161: 12-22; Pltf. Dep. at 96: 4-20.) "They said, if you leave, that means you quit. Are you quitting?" (Pltf. Dep. at 159: 5-7.) "She wanted to go home. She wanted to go home. She asked to go home." (Cooper Dep. at 63: 8-10.) She wanted to call the Call Tyson First Helpline, but she was not permitted. Cooper kept her in the room. Cooper explained even if she called the helpline, the call would filter back to plant, back to HR, back to Cooper. (Cooper Dep at 57: 11-16; Cooper Dep. at 58: 1-4.) Denton told her, however, "No, you're not [going to call the helpline]. (Pltf. Dep. at 159: 13-16.) After the meeting, Cooper requested that both Thomas and Plaintiff provide written statements. (Cooper Dep. at 64:5-9; Pltf. Dep. at 169:4-10.) Cooper demanded Ms. Andriano's statement. Ms. Andriano felt threatened. (Pltf. Dep. at 173: 14-20.) All of this occurred within weeks, if not days, of Ms. Andriano complaints against Tyson.

      b) **Any further disputed issues require a trier of fact to determine liability and damages.**

The disputed issues are whether Defendant took employment action adverse to Plaintiff in the form of retaliatory discharge and whether a causal connection existed between the protected activity and the adverse employment action. Facts exist sufficient to require a trier of fact to determine liability and damages. With that said, Plaintiff vehemently asserts that she received adverse employment action in the form of retaliatory discharge.

## IV. CONCLUSION

As shown above there clearly exist genuine issues of material fact warranting denial of Defendant's motion for summary judgment.

Respectfully submitted,

**Parker & Associates**

/s/ R. Patrick Parker
R. Patrick Parker, BPR # 16847
1517 Hunt Club Boulevard
Gallatin, TN 37075
Telephone:  (615) 724-5291
Facsimile:    (615) 590-4211
pparker@pparkerlaw.com

*Attorney for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this day served, via the Middle District ECF filing system, a true and correct copy of the foregoing pleading upon counsel for the parties, as follows:

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

Kenneth A. Weber, BPR No. 015730
Megan M. Sutton, BPR No. 029419
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
Telephone: (615) 726-5760
Facsimile: (615) 744-5760
Email: kweber@bakerdonelson.com
Email: msutton@bakerdonelson.com

*Attorneys for Defendants*

/s/ R. Patrick Parker
R. Patrick Parker

Case 3:15-cv-00863   Document 37   Filed 03/01/17   Page 25 of 25 PageID #: 387