# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| TRACY ANDRIANO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:15-cv-00863 |
| | ) CHIEF JUDGE CRENSHAW |
| TYSON FOODS, INC., and TYSON FRESH MEATS, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Tracy Andriano brought this action against her former employers, Tyson Foods, Inc., and Tyson Fresh Meats, Inc. (collectively "Tyson"), alleging that Tyson violated federal law during her employment. (Doc. No. 1.) Before the Court is Tyson's Motion for Summary Judgment. (Doc. No. 27.) For the following reasons, Tyson's motion is **DENIED**.

I. UNDISPUTED FACTS

On October 15, 2013, Andriano began working at Tyson's plant located in Goodlettsville, Tennessee, as an Occupational Health Nurse. (Doc. No. 38 at 1.) She directly reported to Simona Thomas, and overall they had a good relationship. (Id. at 2.) Andriano also worked closely with Audrey Cooper, an employee in Tyson's Human Resources Department. (Id. at 1.)

A. TYSON'S HARASSMENT POLICY

Tyson has a Harassment and Discrimination Policy (the "Harassment Policy"), which Andriano received on October 18, 2013. (Id. at 2; Doc. No. 30-2 at 68.) The policy requires that "[a]ll harassment/discrimination must be reported immediately." (Doc. No. 30-2 at 64.) It allows a complainant to report harassment or discrimination by contacting her supervisor and/or her local Human Resources Manager, a Senior Location Management Official, the Director of Human

Resources Operations, the Employment Compliance Department, or the "Tell Tyson First" telephone line. (Id. at 66.) The person reporting the harassment will be asked to complete a Complaint Form, but the Complaint Form is not required to initiate an investigation. (Id.) A certified "harassment investigator" will investigate the harassment or discrimination complaint. (Id.) Any retaliation against an employee who reports harassment or discrimination is forbidden, and a supervisor who is found to have retaliated against a complainant will be disciplined. (Id. at 65.)

B.  THE FIRST INCIDENT

In November 2013, shortly after beginning work at Tyson, Andriano participated in a meeting with plant personnel to investigate an employee injury. (Doc. No. 37-2 at 12.) During this meeting, James Ewing, a general supervisor (id.), told Andriano that he wanted to "see how far [he] could get with [her]." (Doc. No. 38 at 3.) Steve Ligon, the safety manager (Doc. No. 37-2 at 11), instructed Ewing to stop. (Doc. No. 38 at 3.) Andriano reported the incident to Thomas, who reported it to Cooper. (Id.; Doc. No. 42 at 3.) Andriano was not aware of any subsequent investigation into Ewing's behavior. (Doc. No. 38 at 3.) Cooper does not remember whether there was an investigation, but believes there may have been. (Doc. No. 37-2 at 33.) Ewing apologized to Andriano, and Cooper believes Tyson retrained Ewing on the Harassment Policy, but she cannot remember for certain. (Doc. No. 37-2 at 33; Doc. No. 38 at 3-4.) Ewing did not make any further inappropriate comments. (Doc. No. 38 at 3.)

C.  THE GASHI INCIDENT

Since the start of Andriano's employment, Driton Gashi, a coworker, brought her candy at least twice per week. (Id. at 5.) Gashi would often visit the Health Services office to talk with her.

(Id. at 6.) Gashi also frequently stared at Andriano in the hallway. (Id.) Initially, Gashi's behavior did not bother Andriano. (Id. at 5-6.)

In February 2014, Andriano's perception of Gashi's behavior began to change. Gashi began asking Andriano to dinner whenever he visited Health Services. (Id. at 5.) He also started making "kissy noises" when he entered Health Services. (Id. at 6.) When Gashi shook Andriano's hand, he would hold it for longer than the normal length of a handshake, "maybe a couple of seconds." (Id.) At this point, Gashi's previous and ongoing behavior of bringing Andriano candy, visiting her frequently, and staring at her in the hallway began to make Andriano uncomfortable. (Id. at 5-6.) Andriano asked Gashi to stop every time he made her uncomfortable, but he did not stop. (Doc. No. 42 at 6.)

Andriano reported Gashi's behavior to Jetton Gashi, a supervisor and Gashi's brother, at least twice. (Id.) She also reported Gashi's conduct to Thomas at least once per week beginning in February 2014 until Thomas took a leave of absence.[1] (Id. at 7.) Thomas told Andriano that Gashi is "harmless," and the office is a "safe space." (Id.) Thomas advised Andriano not to report her complaints to Human Resources. (Id. at 8.)

On April 10, 2014, Gashi entered the Health Services office and asked Andriano if she was alone. (Id.) Gashi asked Andriano to go to dinner with him and grabbed her hand. (Id.; Doc. No. 38 at 7.) Andriano protested, but Gashi would not let go of her hand. (Doc. No. 38 at 7.) Andriano ran, and Gashi chased her through the nurses' office. (Doc. No. 42 at 8.) Andriano locked herself in her office and Gashi continually tried to open her door. (Id.) Andriano used her radio to announce to her supervisors that she locked herself in her office "for security reasons." (Id.) Ewing came to Andriano's office to investigate. (Id.)

---

[1] It is unclear from the record when Thomas took her leave of absence.

That night, Andriano left a message for Thomas regarding Gashi's conduct, and then reported Gashi's conduct to Thomas in person the next day. (Id. at 10.) Thomas told Andriano that they could not report the incident to Human Resources because Andriano previously had reported Ewing's harassment, and Human Resources would not like a second complaint. (Id.) Rather, Thomas said she would speak to Gashi's supervisor to ensure that Gashi did not return to harass Andriano. (Id. at 11.) Thomas sent Steve Voller, Gashi's supervisor, an email requesting that Gashi avoid socializing with Health Services employees during work hours, but should only be there if he had a medical question. (Id.) Andriano objected to Thomas' email because it did not describe what Andriano reported to her. (Id.)

Also on April 11, 2014, Gashi walked by the Health Services office and made an obscene tongue gesture in the window. (Doc. No. 38 at 7.) On April 14, 2014, Voller visited the Health Services office and Andriano informed Voller about the obscene gesture. (Id.) Voller reported the incident to Cooper, who initiated an investigation. (Id.) Cooper met with Voller, Gashi, and Andriano, and obtained written statements from each of them. (Id. at 8.) Cooper also reviewed video footage of the incident, but did not see any inappropriate tongue gesture. (Id.) Tyson retrained Gashi and Andriano on its Harassment Policy and instructed Gashi to stay away from the Health Services office. (Id.; Doc. No. 42 at 14.) Tyson did not take any further disciplinary action against Gashi. (Doc. No. 42 at 13.) On April 16, 2014, Andriano signed a Complaint Resolution form, reflecting that she had experienced no further misconduct and considered her complaint resolved. (Doc. No. 38 at 8.)

On May 6, 2014, Cooper and Thomas met with Andriano to discuss her handling of an employee injury the previous night. (Id. at 13.) During that meeting, Thomas and Cooper criticized certain aspects of how Andriano handled Gashi's harassing conduct, including using the radio to

4

call for help and locking her office door. (Id.; Doc. No. 42 at 15.) Andriano started crying, and informed Thomas and Cooper that she wanted to go home. (Doc. No. 42 at 15.) Thomas or Cooper told her that if she left, she would be quitting. (Id.) Andriano attempted to call the "Tell Tyson First" line during the meeting, but Cooper told her it was inappropriate to have her phone out during the meeting. (Id. at 16.) Andriano also told Thomas and Cooper that she did not feel that Thomas handled the investigation properly. (Doc. No. 38 at 13.) As a result, Cooper asked both Andriano and Thomas for a written statement. (Doc. No. 30-3 at 20.)

On May 7, 2014, Cooper called Andriano to obtain her statement. (Doc. No. 38 at 14.) A few minutes later, Cooper went to the Health Services Office to obtain Andriano's statement. (Id. at 15.) Andriano told Cooper that she was busy, and Cooper agreed to allow Andriano to provide her statement later that night. (Id. at 14.) Andriano then sent an email to Thomas, Cooper, and two other Tyson employees, explaining that she felt "harassed" and that she is resigning. (Id. at 15.)

Prior to resigning, Andriano did not reported any alleged-retaliatory action as required by the Harassment Policy. (Id. at 17.) After resigning, Andriano called the "Tell Tyson First" line twice, on May 9 and May 15, Tyson did not follow up on either phone call. (Doc. No. 42 at 19.)

II. STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in light most favorable to the party opposing the motion." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the

5

non-moving party [or] that there is a 'genuine issue for trial'" Matsushita, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

III. ANALYSIS

Andriano brings two causes of action against Tyson under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"): (1) hostile work environment based on sexual harassment and (2) retaliation. (Doc. No. 1.) Tyson moves for summary judgment on both claims. (Doc. No. 27.)

A. HOSTILE WORK ENVIRONMENT

Tyson moves for summary judgment on Andriano's harassment claim because the harassing conduct was not severe and pervasive and Tyson's response was prompt and reasonable. (Doc. No. 32 at 15-20.) Andriano argues that Ewing and Gashi's behavior prove the harassment was severe and pervasive and that Tyson's response was inadequate. (Doc. No. 37 at 15-19.)

To prevail on a hostile work environment claim, a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile,

or offensive; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective action. Bailey v. USF Holland, Inc., 526 F.3d 880, 885 (6th Cir. 2008). It is undisputed that, viewing the facts in the light most favorable to Andriano, she can prove the first three elements. (Doc. No. 32.)

Tyson argues that Andriano did not provide sufficient facts for a reasonable jury to find that the charged sexual harassment was so severe and pervasive that it altered the conditions of her employment. In determining whether harassment was "severe and pervasive," courts consider a non-exhaustive list of relevant factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening, or a mere utterance; and whether it unreasonably interferes with an employee's performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). None of the factors are required, and instead the Court must weigh the factors in view of the totality of the circumstances. Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999) (citing Harris, 510 U.S. at 23).

Here, every one of the Harris factors would allow a reasonable juror to find that Andriano suffered severe and pervasive sexual harassment while at Tyson. 510 U.S. at 23. Starting in February 2014 and for three months of her seven-month employment, Gashi came into Andriano's office and engaged in sexually suggestive conduct to her. Andriano asked him to stop and he did not. Andriano asked her supervisor to make it stop and she did not. Gashi gave her candy, asked her on dates, and inappropriately held her hand. Ultimately, the harassment culminated with Gashi chasing Andriano around her office, and a reasonable inference from that incident is that Gashi intended to sexually assault her. After weighing the relevant factors, a reasonable jury could find that the sexual conduct Andriano suffered at Tyson altered the conditions of her employment.

Tyson also argues that it is not liable for Gashi's harassing conduct. An employer is liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 338 (6th Cir. 2008) (quoting Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 873 (6th Cir. 1997) (overruled on other grounds)). A response is generally adequate if it is "reasonably calculated to end the harassment." Id. at 340 (quoting Jackson v. Quanex Corp., 191 F.3d 647, 663-64 (6th Cir. 1999).

Viewing the facts in the light most favorable to Andriano, Tyson can be held liable for Gashi's harassment. According to Andriano, Gashi came into her office at least twice per week since she started working at Tyson. In February 2014, she began to feel uncomfortable and reported Gashi's behavior to her supervisor weekly. The supervisor's response—to ignore the harassment because Gashi is "harmless"—cannot seriously be argued to be "reasonably calculated to end the harassment." Id. Then, after Gashi's attempted assault on Andriano, Thomas told Voller that Gashi should not come into the office during work hours because socializing during work hours is inappropriate. While Tyson argues this response is "reasonably calculated to end the harassment," and Tyson claims it did end the harassment, the record shows that the next day Gashi returned to Andriano's office and made an obscene tongue gesture.[2] Based on Tyson's apparent lack of response for over two months, Tyson can be held liable for Andriano's harassment claim. Accordingly, Tyson's motion for summary judgment on the hostile work environment claim is denied.

---

[2] While Tyson's action after Gashi's tongue gesture ended his harassment of Andriano, there is evidence that he continued to stare at other women at Tyson, making them feel uncomfortable. (Doc. No. 42 at 18.)

B. RETALIATION

Tyson moves for summary judgment on Andriano's Title VII retaliation claim because Andriano did not suffer an adverse employment action, Andriano cannot establish causation, and there is no evidence that Tyson's legitimate, nonretaliatory reasons for its actions were pretextual. (Doc. No. 32 at 20-24.) Andriano argues that she can establish a prima facie case, although she does not address pretext. (Doc. No. 37 at 21-25.) However, both parties overlook the direct evidence of retaliation in the record.

Under Title VII, a plaintiff can "establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 543 (6th Cir. 2008) (citing DiCarlo v. Potter, 358 F.3d 408, 420 (6th Cir. 2004)). "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a" "but-for cause" of the employer's action. Id. at 543-44 (citing Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003)); University of Tx. Sw. Medical Ctr. v. Nasser, 133 S.Ct 2517, 2534 (2013) (requiring "but-for" causation).

Here, Andriano reported Gashi's harassing behavior to Thomas every week. Thomas told Andriano not to report her complaints to Human Resources, and worse, Thomas did not take the claims to Human Resources as required by the Harassment Policy. Thomas stated that Andriano previously complained about Ewing's behavior and Human Resources would not like a second harassment complaint. Thomas' refusal to take Andriano's complaints against Gashi to Human Resources and to dissuade or forbid Andriano from taking her own complaints against Gashi to Human Resources is direct evidence that Tyson retaliated against Andriano for filing her harassment claim against Ewing. See Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013)

(quoting Garner v. Cuyahoga Cty. Juvenile Court, 554 F.3d 624, 639 (6th Cir. 2009) (holding that an adverse employment action is an action where a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.")). Accordingly, Andriano can support her claim of retaliation with direct evidence.

When a plaintiff supports her claim of retaliation with direct evidence, the burden shifts to the defendant to prove that "it would have made the same decision absent the impermissible motive." Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 648 (6th Cir. 2015) (quoting Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 346-47 (6th Cir. 2012)). Tyson does not argue that it meets its burden. As such, summary judgment on Andriano's retaliation claim is denied.

C. CONSTRUCTIVE DISCHARGE

Tyson argues that the Court should not allow Andriano to assert a constructive discharge claim at trial because she did not plead one. (Doc. No. 32 at 24.) Alternatively, Tyson contends that the Court should grant it summary judgment on the constructive discharge claim. (Doc. No. 32 at 24-25.)

Constructive discharge stems from and "can be regarded as an aggravated case of, sexual harassment or hostile work environment." Penn. State Police v. Suders, 542 U.S. 129, 147 (2004). Andriano pleads a hostile work environment claim and asks for front pay and back pay. (Doc. No. 1 at 6-7.) Under the lower pleading standard of Federal Rule of Civil Procedure 12(c), this is sufficient to state a claim for constructive discharge. See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) (holding that a complaint must contain sufficient factual matter to state a claim for relief

that is plausible on its face). By asking for front pay and back pay after resigning, Andriano put Tyson on notice that she believed Tyson constructively discharged her.  (Doc. No. 1 at 6-9.)

Andriano also set forth sufficient facts to allow a jury to decide whether she is entitled to damages from her constructive discharge. To obtain damages stemming from a constructive discharge, a plaintiff must "show working conditions so intolerable that a reasonable person would have felt compelled to resign." Penn. State Police, 542 U.S. at 147. Applying the summary judgment standard, there is a disputed question of fact on whether the alleged repeated sexual conduct toward Plaintiff and Defendant's repeated failure to remediate resulted in her termination. Accordingly, the Court denies Tyson's motion on this claim.

IV. CONCLUSION

For the foregoing reasons, Tyson's Motion for Summary Judgment (Doc. No. 27) is **DENIED**.

The Court will issue an accompanying order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE